## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Securities and Exchange Commission,

      Plaintiff,

  v.

**Civil No. 3:21-cv-1455**

Back to Green Mining, LLC,
José M. Jiménez Cruz,
Manuel Portalatin,

      Defendants.

## **COMPLAINT**

Plaintiff, United States Securities and Exchange Commission ("Commission" or "SEC") alleges as follows:

## **INTRODUCTION**

1.    From August 2016 through the end of 2020, Back to Green Mining, LLC ("Back to Green") through its President and Chief Executive Officer ("CEO"), José Jiménez Cruz ("Jiménez"), defrauded investors through an illegal unregistered securities offering to share in the profits of a "green" gold and platinum mining venture operating in Ayapel, Colombia. Back to Green raised more than $2.7 million from investors, through the sale of unregistered investment contracts during this period, most of whom are residents of Puerto Rico. Jiménez authorized and placed false and misleading newspaper and radio advertisements in Puerto Rico that promised exorbitant returns on the investment, and provided investors with false and misleading Pitch Decks that misrepresented the status of the mining operations.

2.    From 2016 through 2020, Manuel Portalatin ("Portalatin"), as the CEO of the Colombian mining company affiliated with Back to Green, and from September 2018 through

2020 as a Managing Member of Back to Green, directly engaged in the offer and sale of Back to Green's unregistered securities by signing investment contracts with investors.

3.       From at least October 2016 through June 2017, Back to Green and Jiménez solicited investors in their profit sharing venture through false and misleading radio and newspaper advertisements disseminated in Puerto Rico promising incredible profits, including 40 percent monthly returns that would begin to flow within a "few months" of investing with Back to Green.

4.       Then, from at least January 2018 through January 2020, Back to Green and Jiménez continued to provide investors with materially false and misleading information in Pitch Decks that they provided to investors about the timing and status of the mining operation that formed the basis of the profit sharing venture.  Among other false and misleading statements, Back to Green and Jiménez falsely claimed that Back to Green had obtained the necessary government permits and licenses for the mining operation when it had not done so.

5.       Jiménez knew at the time that he and Back to Green provided this information to investors, or was reckless in not knowing, that it was false and misleading.  He knew that the mining venture was a multiphase, multiyear project that had just *begun* at the end of 2016.  And he knew that when he and Back to Green promised immediate returns to investors, in reality the operation was years away, if ever, from being able to extract gold or platinum from the ground and sell it for profit.  In fact, in late 2020 Jiménez conceded that only at that time had Back to Green purportedly completed its three-and-a-half year "exploration" phase of operations, and only at that time purportedly was ready to *enter* the "exploitation" phase of operations, in which Back to Green could finally *begin* to bring minerals to market.  Prior to that point, Back to Green

Case 3:21-cv-01455-GAG   Document 1   Filed 09/21/21   Page 3 of 24

had not extracted or sold one ounce of gold or platinum from the ground or generated one dollar of earnings.

6.     In addition, at the time that Back to Green provided this information to investors, Jiménez knew, or was reckless in not knowing, that Portalatin, in charge of mining operations, had not (and at least as late as February 2021, still had not) secured the necessary mining licenses and permits from the Colombian government.  Portalatin had engaged in a years-long back and forth with the Colombian mining agency and had failed to provide paperwork repeatedly demanded by the agency demonstrating, among other things, adequate financial capacity to support the mining venture.

7.     Accordingly, Back to Green and Jiménez knew at the time that they made their false representations to investors, or were reckless in not knowing, that Back to Green would not be able to pay returns to investors, if at all, for many years, let alone 40 percent returns, within a "few months," as promised.  Portalatin knew, or was reckless in not knowing, that Jiménez was making false and misleading statements to investors about Back to Green, the mining operations he controlled, and the investment opportunity.  Nonetheless, Portalatin made presentations to solicit additional investors and continued to bring investors into the Back to Green venture by signing investment contracts that deceived and operated as a fraud on Back to Green investors.

8.     In total, from 2017 to 2020 defendants raised more than $2.7 million from at least 150 investors, through their unregistered securities offering, by means of false and misleading misrepresentations and omissions of material fact, as well as deceptive acts and a course of conduct designed to defraud investors.  To this date, investors have received no returns on their investments.

9.      This is not the first regulatory action faced by Back to Green.  In December 2019, Back to Green, through Jiménez, entered into a Consent Order with the Puerto Rico financial regulator, Office of the Commissioner of Financial Institutions ("OCFI"), in which Back to Green agreed to cease and desist from "entering into contracts with Puerto Rican clients if the securities . . . are not registered or exempt of registration by the OCFI"; remove all promotion of Back to Green's investment; and pay $15,000 to the Puerto Rico Secretary of the Treasury.

10.     Despite having entering into the Consent Order, Back to Green did not stop soliciting and raising investor funds in Puerto Rico.  Jiménez and Portalatin continued to sell unregistered securities in the Back to Green mining operation until at least July 2020.

11.     As a result of the conduct alleged in this Complaint, defendants violated the registration and anti-fraud provisions of the federal securities laws, specifically, the Securities Act of 1933 (the "Securities Act") Sections 5 and 17(a) [15 U.S.C. §§ 77e, 77q(a)], the Securities Exchange Act of 1934 (the "Exchange Act") Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

12.     The Commission requests that the Court enjoin defendants from further violations of the federal securities laws as alleged in this Complaint, and order them to pay disgorgement and a monetary penalty based upon those violations.

## DEFENDANTS

13.     **Back to Green Mining, LLC ("Back to Green")** is a Puerto Rico limited liability corporation, formed by Jiménez on August 9, 2016, with its principal place of business in Caguas, Puerto Rico.  The company has never registered an offering of securities with the Commission, its securities are not listed on any exchange, and it has never been an SEC reporting company.  Back to Green is a corporate affiliate and stockholder of Back to Green

4

S.A.S. ("BTG SAS"), the affiliated entity that Jiménez and Portalatin created to run mining operations in Colombia. According to corporate documents, Back to Green currently owns approximately 17 percent of BTG SAS. In December 2019, Back to Green entered into a Consent Order with OCFI, predicated on the same types of securities transactions at issue in this Complaint.

14.     **José Jiménez Cruz ("Jiménez")**, 66, is a resident of Caguas, Puerto Rico. He is the founder, President, CEO, and a Managing Member of Back to Green, and a shareholder of BTG SAS. Prior to forming Back to Green, Jiménez had no mining experience.

15.     **Manual Portalatin Rivera ("Portalatin")**, 46, is a resident of Medellin, Colombia. Portalatin is a United States citizen. He is the founder and CEO of BTG SAS, and a Managing Member of Back to Green. Prior to forming Back to Green, Portalatin had no mining experience.

## RELATED ENTITY

16.     **Back to Green S.A.S ("BTG SAS")** is a Colombian corporation formed by Portalatin on or about July 25, 2016, with its principal place of business in Medellin, Colombia. The company has never registered an offering of securities with the Commission, and its securities are not listed on any exchange. BTG SAS is a corporate affiliate of Back to Green. Back to Green, Jiménez, Portalatin, and two other individuals, are stockholders of BTG SAS, and Jiménez, Portalatin, and the two other individuals are directors of BTG SAS.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

18.     This Court has personal jurisdiction over defendants, and venue is proper in this

District, because Back to Green is incorporated in this District, Jiménez is a resident of this

District, and defendants engaged in certain acts and transactions constituting violations of the

Securities Act and Exchange Act, such as investor solicitations, meetings, securities sales, phone

calls, and other communications in this District.

19.     In connection with the conduct alleged in this Complaint, specifically the

solicitation and sale of unregistered securities, the making and dissemination of fraudulent

statements, and the undertaking of fraudulent acts and practices, defendants, directly and

indirectly, singly or in concert with others, made use of the means or instrumentalities of

interstate commerce, the means or instruments of transportation or communication in interstate

commerce, such as through radio ads, e-mail, WhatsApp messages, the telephone, and the mail.

## DEFENDANTS' ACTS IN VIOLATION OF THE FEDERAL SECURITIES LAWS

### A.     Back to Green's Unregistered Securities Offering

20.     Beginning in August 2016, Back to Green (the Puerto Rico company) and BTG

SAS (its Colombian affiliate), by and through their principals, Jiménez and Portalatin, offered

and sold to potential investors an opportunity to share in the profits of a "green" gold and

platinum mining venture located at a site in Ayapel, Colombia.

21.     The defendants raised capital for the Back to Green venture through a securities

offering in the form of profit sharing investment contracts.  From 2016 to 2020, defendants

raised more than $2.7 million from investors who signed such investment contracts.

22.     From 2016 through 2019, more than 150 investors agreed to participate in the

Back to Green venture by entering into profit sharing investment contracts (the "BTG Profit

Sharing Contract").  The BTG Profit Sharing Contracts purported to give investors the rights to a

specific percentage of BTG SAS's net profits from the mining project, to be paid on a monthly basis, through Back to Green.  After signing an initial contract, some investors made additional investment payments to enhance their opportunity to obtain a higher percentage of the profits. The majority of investors reside in Puerto Rico.

23.     The specific percentage of net profits that each investor was to receive under the BTG Profit Sharing Contract depended upon how much each investor paid into the opportunity. For example, one investor in November 2016 was to receive the rights to 0.5% of the net profits from the project, in exchange for investing $20,000.  That individual subsequently invested an additional $10,000, for the right to receive a total of 0.75% of the profits, and later invested yet another $10,000, to receive an aggregate 0.82%.

24.     Effective August 31, 2018, Back to Green unilaterally issued a Limited Liability Operational Agreement ("Operational Agreement"), pursuant to which Jiménez and Portalatin were named as the sole "Managing Members" of Back to Green.  Also, under the Operational Agreement, the investors who had signed the original BTG Profit Sharing Contracts were deemed to be "Investor Members" of Back to Green, albeit "without speaking or voting rights," and were entitled to the same percentage share of the mining project's profits as under the original profit-sharing contracts.  However, under this new arrangement, investors were to receive profits "from" Back to Green, based on its export of "qualified services" to BTG SAS, as opposed to the original arrangement, in which investors were to be paid earnings, "in connection with the net income of" BTG SAS "through" Back to Green.

25.     Pursuant to the new arrangement, Investor Members were provided with certificates evidencing their Back to Green Investment Units.  Although the change did not take place immediately, beginning in at least May 2019, investors began to enter into "Investment

Contracts" (instead of "BTG Profit Sharing Contracts"), pursuant to which they received a specific number of Investment Units in Back to Green.  Both Jiménez and Portalatin continued to solicit investors, sell them the investment units, sign, and distribute the Investment Contracts to investors on behalf of Back to Green.

26.     The defendants' offer and sale of investment contracts that allowed investors to share in profits of the Back to Green venture was a securities offering.  Under both the BTG Profit Sharing Contracts and the Investment Contracts, individuals invested their money in a common enterprise, the mining operation in Colombia, and defendants led them to expect profits solely from the efforts of third parties, the operators of the mine.

27.     The defendants' securities offering was not registered with the Commission, as required, and none of the exceptions or safe harbors to the Commission's registration requirements were applicable.

28.     Each of the defendants was directly involved in the offer and sale of the unregistered securities offering, by way of, among other actions, soliciting investors, signing the investment contracts, and receiving, depositing, and using investor funds.

29.     Back to Green, through Jiménez, offered and sold securities through the use of the mails and interstate commerce.  It used mail, e-mail, wire transfers, radio broadcasting, and the internet to solicit investors and to offer, sell, and distribute the securities.

30.     Jiménez and Portalatin each offered and sold securities through the use of the mails and interstate commerce.  As outlined further below, Jiménez advertised the offerings in newspapers and on the radio and provided information by telephone, WhatsApp message, and e-mail to investors about the opportunity.  He instructed others to create the investment contracts and then provided them to investors for their signatures.  He collected the investors' checks and

deposited them.  He managed and directed Back to Green in its offering, and, beginning in 2020, he signed the Investment Contracts that succeeded the BTG Profit Sharing Contracts.

31.     Portalatin signed the BTG Profit Sharing Contracts on behalf of BTG SAS.  In addition, beginning in September 2018, Portalatin joined Jiménez as a Managing Member of Back to Green.  Thereafter, he met with investors, made presentations to investors, and, and in 2020, signed the Investment Contracts on behalf of Back to Green.

       **B.**     <u>**Overview of the Back to Green Venture**</u>

32.     The Back to Green venture was organized into two separate, but interworking, components:  the investor component, led by Jiménez and Back to Green, operating primarily in Puerto Rico; and the mining component, led by Portalatin and BTG SAS, operating primarily in Colombia.

33.     While each component had separate roles and responsibilities, the representatives of both components, including Jiménez and Portalatin, regularly assisted and communicated with each other and kept each other updated on ongoing events.

34.     Back to Green and Jiménez were the fund-raising and financial arm of the venture.  They were responsible for soliciting and communicating with investors, gathering investors' funds, and disbursing funds to pay for the purported mining operations.

35.     As set forth further below, Back to Green and Jiménez placed and paid for false and misleading advertisements on behalf of the venture; organized and held in-person meetings in Puerto Rico and Colombia; sent investors written materials containing false and misleading information about the Back to Green venture; and negotiated and facilitated the execution of the investment contracts with investors who participated in the unregistered offering.

36.     Jiménez was primarily in charge of collecting and disbursing funds from investors.  He had sole control of the Back to Green accounts into which, from 2016 to 2019, he deposited more than $2.7 million in investor funds received from approximately 150 investors.  During this same period, Jiménez withdrew every dollar that investors deposited into these Back to Green accounts, and disbursed and transferred the funds to various recipients, most notably to himself and Portalatin, and to family members, with insufficient documentation to record or memorialize the purposes for the disbursements.

37.     While defendants appear to have spent some investor funds on actual mining operations, in particular, some mining equipment, the amount invested does not represent even close to the $2.7 million contributed by investors.  Moreover, company records do not include sufficient business documentation to confirm that such equipment was actually delivered to the site, in working order, and necessary to the particular needs of the operation.

38.     BTG SAS and Portalatin made up the technical, mining component of the Back to Green venture.

39.     Portalatin had no prior experience in mining.  Prior to starting BTG SAS, he ran various businesses that sold items such as furniture and jewelry.  Nevertheless, Portalatin was in charge of organizing and operating the purported mining operations in Colombia.  He was responsible for obtaining the appropriate licenses and/or permits from the Colombian government ("mining permits"), and taking all other steps required to explore and extract gold and platinum from the ground, process and refine it, transport it to market, and sell it for profit.

40.     Portalatin and BTG SAS appear to have identified a site in Colombia on which to mine, but at least as late as February 2021, Portalatin was not able to secure the necessary mining

permits from the Colombian government, despite repeated promises made to investors, from 2018 onwards, that such requirements had been fulfilled and completed.

41.     Documents from the Colombian Mining Agency (Agencia Nacionale de Minería) show that from at least 2016 through 2019, Portalatin had attempted to obtain the mining permits from the agency, but was unable to secure them.  At all relevant times a third party, not Portalatin or BTG SAS, had those rights, and Portalatin's repeated attempts to obtain those rights from the Mining Agency were not successful.  Correspondence with the Mining Agency indicates that at least as late as October 2019, Portalatin had not provided sufficient documentation to support his application, as repeatedly demanded by the Mining Agency, including proof of the venture's economic capacity and the value of the investment in the mining operation.

42.     In addition to lacking mining permits from the Mining Agency, as late as December 2020, BTG SAS was still not ready to begin the process of extracting gold or platinum from the ground.

43.     In fact, on November 30, 2020, Jiménez conceded when giving testimony to the SEC that developing a mining operation was a long, multiphase, multiyear process -- a fact that he knew even when starting the Back to Green venture in 2016.  Jiménez explained that there are three "processes" or phases to mining – as translated:  (1) "camping" (likely encampment) – where the venture sets up the encampment at the site where the employees will live and work; (2) "exploration" – where the venture analyzes the ground for minerals and determines what equipment it needs to mine; and (3) "exploitation" – where the venture "prepares [itself] to go out on the market to sell the materials" -- presumably by extracting the minerals from the ground, refining and processing them, transporting them to market, and selling them for profit.

44.     In late 2020, Jiménez knew and conceded that BTG SAS had not begun "production," and only at that time purportedly was preparing to enter the "exploitation" process. Prior to that point, BTG SAS was still in the "exploration" phase, which lasted "three-and-a-half years" from the beginning of mining operations in late 2016, until it was put on hold by the Covid-19 pandemic shutdown, presumably in early 2020.

45.     On December 4, 2020, Portalatin similarly testified that, as of that date, the company was not yet ready to extract gold or platinum from the ground, much less sell it into the marketplace to generate earnings. Before the Covid-19 pandemic shut down operations, BTG SAS was still waiting for equipment to arrive, and in late 2020 was still in the process of implementing and maintaining that equipment.

46.     In sum, as described by Jiménez and Portalatin, from late 2016 through at least the end of 2020, BTG SAS had not begun "production"; was engaged in the multi-year "exploration" phase; had not entered the "exploitation" phase whereby minerals could be brought to market; had not sold any gold or platinum; and had not even *begun* to extract gold or platinum from the ground for profit. Accordingly, any earlier representations by Jiménez or Back to Green promising or inferring to the contrary, in terms of mining activity or sales or profits, would be, and were knowingly or recklessly, false and/or misleading.

47.     In addition to running the mining operations, Portalatin also played key roles in the investor component of the Back to Green venture. At all relevant times he signed the BTG Profit Sharing Contracts and Investment Contracts. In addition, at all relevant times Portalatin knew, or was reckless in not knowing, about the status of the mining operations, including that not one ounce of gold or platinum had been extracted from the ground for profit, or sold on the market, and that he had not secured the mining permits. After he became a Managing Member

of Back to Green in September 2018, Portalatin knew, or was reckless in not knowing, that Back to Green and Jiménez were providing false and misleading statements to investors and prospective investors about the mining operation. Yet, he continued to attend in-person meetings and lunches with investors, provide written, video, and audio updates to investors regarding the status of mining operations, and sign investment contracts bringing additional money into the venture.

### D.   False Statements in Newspaper and Radio Advertisements

48.     Beginning in October 2016, Back to Green, through Jiménez, began to advertise the profit sharing opportunity in newspaper and radio ads in Puerto Rico. These advertisements were general solicitations designed to reach, and did indeed reach, thousands of potential investors. Jiménez had ultimate control over the content, timing, and placement of the ads.

49.     On October 6 and October 9, 2016, Back to Green, through Jiménez, ran newspaper ads in the print and online editions of the Puerto Rican newspaper, *El Nuevo Día,* the most widely read newspaper in Puerto Rico, with a daily circulation at the time of more than 200,000 print copies, and a readership of approximately 1.2 million. Jiménez placed the advertisement with the newspaper and paid for it with funds from Back to Green's bank account.

50.     The ad ran with the name "BACK TO GREEN MINING" and asked potential investors, "Would you like to have your money work for you?" The ad stated that "For every $10,000 you receive $4,000 monthly." Two phone numbers were listed in the ad, one belonged to Jiménez and the other to his wife.

51.     Below is the ad, as translated into English by a certified translator:



*English Translation of the Advertisement*

52.      The radio ads began to run in October 2016 and continued into June 2017.

Jiménez arranged for the advertisements, provided the content to the radio stations, and paid for

them with funds from a Back to Green bank account.

53.      The first ads began to run on a Puerto Rico FM station on October 21, 2016.

Approximately 150 ads ran on that station between that date and March 22, 2017, between

6:00 a.m. and 7:00 p.m.  The radio advertisements built on the content in the newspaper ads,

stating that investors would begin to receive the promised $4,000 monthly return on their

investments "in just a few months."  As translated in English, the ads stated:

> Attention! A company is looking for capital to finance the final stage of the
> beginning of its operations. Invest as little as $10,000 and start receiving $4,000
> per month for every $10,000 you invest, in just a few months! For more
> information, call (787) 444-1337. 444-1337.

54.      The phone number provided in the radio ads belonged to Jiménez.

55.      On May 17, 2017, Back to Green, through Jiménez, bought ads to run on a second

Puerto Rico FM station for two weeks in May, and subsequently bought ads to run on that same

station for two weeks in June 2017.  These ads contained the same false and misleading content

as the earlier ones.

56.      Investors entered into profit sharing agreements with, and provided money to,

Back to Green as a result of these advertisements.  During the eight months that the

advertisements ran, at least 26 investors signed profit sharing contracts with BTG SAS and sent their checks and wires to Back to Green.  None of those 26 investors ever received any payments or return on their investments from Back to Green.

57.     Jiménez and Back to Green knew at the time they placed these ads that they were false and misleading.  In order for Back to Green to begin selling gold and platinum for profit in Colombia, the defendants needed to have full regulatory authority to do so; and also, mining operations at the site had to progress beyond the "exploration" phase, and into the "exploitation" phase.  As Jiménez knew at the time, or was reckless in not knowing, neither of these conditions were met in 2016 or 2017, and indeed were still not met in late 2020.

58.     At the time when Jiménez and Back to Green placed the ads, Jiménez knew, or was reckless in not knowing, as outlined above, that Portalatin and BTG SAS had not secured mining permits from the Colombian government.

59.     In addition, even if BTG SAS had secured the necessary mining permits, Jiménez knew, as outlined above, that, at best, the mining process would take years until production could begin.  He knew that the exploration phase alone was a three-and-a-half year process that had *just begun* in late 2016.  Accordingly, when the ads ran in 2016 and 2017, Jiménez knew, or was reckless in not knowing, that there was no possible way that investors would receive a 40 percent per month return on investment, let alone any amount, within a "few months" of investing.

60.     Beginning in at least October 2016, Jiménez provided investors and potential investors with a projections spreadsheet that supported and expanded upon the promises of incredible returns made in the radio and newspaper ads.  The projections spreadsheet was incorporated by reference into a PowerPoint presentation that likewise was provided to potential investors.  At least one version of the spreadsheet that Jiménez provided to potential investors

specified that monthly returns ("profitability payment") on a $10,000 investment would be $4,266.56, and that monthly returns would begin in 4 months.  These statements were false and misleading for the same reasons as with respect to the radio and newspaper ads.  Jiménez knew at the time, or was reckless in not knowing, that the venture was years away from even beginning to extract and sell gold or platinum for profit.

      **F.**      **False Statements in Presentations, Slide Decks, and Updates**

61.      From at least 2017 to 2020, Jiménez and Portalatin, on behalf of Back to Green, organized and held a number of meetings with potential and actual investors in Puerto Rico and Colombia.  From the dates on presentations, agendas, and other documents produced by the company, it appears that they held investor meetings at least in January 2018, May 2019, October 2019, and January 2020.  Approximately 80 to 100 investors attended the meetings, which defendants hosted in various meeting spaces, with at least one meeting held virtually over a web platform.  Defendants also hosted smaller gatherings with investors over meals at restaurants, in a golf club, and in certain private residences.

62.      At these meetings, Jiménez, Portalatin, and others acting at their direction, on behalf of Back to Green, gave presentations to potential and actual investors in which they delivered information about the mining venture, including financial information and status updates regarding mining operations.

63.      Upon information and belief, at no time during these meetings and presentations did Jiménez, Portalatin, or any other representative acting on behalf of Back to Green indicate to investors that BTG SAS had not acquired the necessary mining permits from the Colombian government.

64.    Corresponding with these meetings, and in furtherance of defendants' efforts to solicit and retain investors, beginning in at least September 2018, Jiménez and Back to Green disseminated to investors and potential investors various Pitch Decks that included materially false and misleading statements about the mining venture.

65.    In or about January 2018, Back to Green distributed a Pitch Deck to investors entitled "Back to Green Mining, Investors Pitch Deck (Rev. 3.1)." ("The January 2018 Pitch Deck").  The January 2018 Pitch Deck listed Jiménez as General Manager of Back to Green Mining, LLC, and Portalatin as CEO of Back to Green S.A.S., Colombia.

66.    The January 2018 Pitch Deck stated that the "Short-term Goal" was to raise an additional $220,000 by January 31.  Several individuals presented with this information signed investment contracts with and sent money to Back to Green.

67.    The January 2018 Pitch Deck contained false and misleading statements about the Back to Green venture, including in the following timeline:  "Traction; Back to Green Mining Timeline":

68.     For example, "August 2016 - Consession (sic) Secured.  Permits & requirements completed in compliance with the Colombian Government" was a false and misleading statement.  As outlined above, as Jiménez and Back to Green knew, or were reckless in not knowing, Portalatin and BTG SAS had not been able to "secure" or "complete" the mining permits with the Colombian government.  In addition, the "we are here" statement, coming at the end of the timeline seemingly is dependent upon defendants securing the appropriate permits to mine on the land, and, therefore, defendants knew or were reckless in not knowing that the statements, in particular regarding the "initial production phase," were not accurate.

69.     Back to Green prepared other versions of the Pitch Deck, including ones labeled May 2019 (Rev. 8.1) and January 2020 (Rev. 9.1).  On information and belief, Back to Green and Jiménez presented these Pitch Decks to investors at the meetings described above, in or around the dates indicated on the Pitch Decks.  In addition, records from one investor indicate that Back to Green sent the January 2020 Pitch Deck to him by email.  The other iterations of the Pitch Decks made false and misleading statements similar to the ones in the January 2018 Pitch Deck.  Back to Green simply changed the numbers and dates slightly to update the content without correcting the underlying misstatements.

70.     Several individuals presented with the Pitch Decks during this period invested in Back to Green and signed – investment contracts.

71.     Jiménez routinely sent updates on the mining project to investors via the WhatsApp messaging service.  Some of the updates included recordings of Portalatin discussing the project and reasons for delays.  Portalatin, Jiménez, and others at their direction, also made presentations at Back to Green investor meetings regarding the status of mining operation.

72.     In meetings and correspondence with investors, Jiménez periodically requested that they invest additional funds in exchange for a larger share of the mining profits.  He also requested loans from investors to cover costs associated with the project.

**G.     Back to Green's Prior Regulatory Action Before the Office of Commission of Financial Institutions**

73.     OCFI is an office of the Department of Treasury of Puerto Rico that supervises and regulates Puerto Rico's financial sector to ensure its safety and soundness, as well as to oversee adherence to all applicable laws and regulations.

74.     In 2017, OCFI commenced an investigation of Back to Green's securities offering promoted through the local newspaper and radio advertising described above.  The investigation was undertaken to ascertain, among other things, whether Back to Green had complied with the Puerto Rico Uniform Securities Act.

75.     To resolve the OCFI investigation, on December 4, 2019, Back to Green, through Jiménez, entered into a Consent Order with OCFI, in which Back to Green agreed to cease and desist from "entering into contracts with Puerto Rican clients if the securities . . . are not registered or exempt of registration by the OCFI"; remove all promotion of Back to Green's investment; and pay $15,000 to the Puerto Rico Secretary of the Treasury.  Jiménez executed the Consent Order on behalf of Back to Green.

76.     Despite having entering into the Consent Order, Back to Green did not stop soliciting and raising investor funds in Puerto Rico.  As described above, Jiménez and Portalatin continued to sell Back to Green Investment Units until at least 2020.

## CLAIMS FOR RELIEF

### COUNT I

### Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

77.     The Commission realleges and incorporates by reference paragraphs 1 through 8, 11 through 22, and 32 through 72.

78.     By engaging in the acts and conduct alleged above, Jiménez, Portalatin, and Back to Green directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, (1) knowingly or recklessly employed devices, schemes, or artifices to defraud; (2) with negligence, obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (3) with negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers, in violation of Section 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

79.     Through fraudulent solicitations and statements, Defendants signed contracts with investors and obtained money from those investors to support the Back to Green venture.  By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### COUNT II

### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### [15 U.S.C. § 78q(b), 17 C.F.R. § 240.10b-5]

80.     The Commission realleges and incorporates by reference paragraphs 1 through 8, 11 through 22, and 32 through 72.

81.     By engaging in the acts and conduct alleged above, Jiménez and Back to Green directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a), (b) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

82.     By engaging in the acts and conduct alleged above, Portalatin directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national security exchange, knowingly or recklessly, (a) employed devices, schemes, or artifices to defraud; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and subsections (a) and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

83.     Through fraudulent solicitations and statements, Defendants signed contracts with investors and obtained money from those investors to support the Back to Green venture.  By reason of the foregoing, all Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

21

## COUNT III

## Violations of Section 5(a) and (c) of the Securities Act

## [15 U.S.C. § 78e(a) and (c)]

84.     The Commission realleges and incorporates by reference paragraphs 1 through 31.

85.     By engaging in the conduct described above, Defendants singly or in concert, directly or indirectly:  made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; and/or  made use of a means or instrument of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities through the use or medium of a prospectus or otherwise.

86.     Defendants offered and sold investment contracts to approximately 150 investors while no valid registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the offering or transactions that resulted in the issuance of such securities, and no exemption or safe harbor from registration was available.

87.     By reason of the foregoing, Defendants violated, and unless enjoined will again violate, Section 5(a) and (c) of the Securities Act [15 U.S.C. § 78e(a) and 78e(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

## I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e, 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## II.

Permanently enjoining Defendants Jiménez  and Portalatin from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of securities in an offering not registered with the Commission, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts;

## III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## IV.

Ordering Defendants to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  September 21, 2021

Respectfully submitted,

Of Counsel:
Carolyn M. Welshhans
David Frohlich

Paul W. Kisslinger (No. G03403)
Elisabeth M. Grimm (No. G03404)
Michelle I. Bougdanos (No. G03405)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4427 (Kisslinger)
*KisslingerP@sec.gov* (Kisslinger)

*Counsel for Plaintiff Securities and Exchange Commission*